JUDGE CROTTY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

09 CIV 7392

RECEIVED
AUG 21 2009

| | |
|---|---|
| JACK MCBRIDE, on Behalf of Himself and all Others Similarly Situated, | CIVIL ACTION NO. _____ |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| PROSHARES TRUST; PROSHARE ADVISORS LLC; SEI INVESTMENTS DISTRIBUTION CO.; MICHAEL L. SAPIR; LOUIS M. MAYBERG; RUSSELL S. REYNOLDS, III; MICHAEL WACHS; and SIMON D. COLLIER, | CLASS ACTION COMPLAINT |
| Defendants. | |

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, allege the following, based on counsel's investigation, documents filed with the United States Government and Securities and Exchange Commission (the "SEC"), reports and interviews published in the press, and information obtained by Plaintiff.

## I.     SUMMARY OF ACTION

1.     This is a class action on behalf of all persons who purchased or otherwise acquired shares in the UltraShort Real Estate ProShares fund (the "SRS Fund"), an exchange-traded fund ("ETF") offered by ProShares Trust ("ProShares" or the "Trust"), pursuant or traceable to ProShares' false and misleading Registration Statement, Prospectuses, and Statements of Additional Information (collectively, the "Registration Statement") issued in connection with the SRS Fund's shares (the "Class"). The Class is seeking to pursue remedies

under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). This action asserts strict liability and negligence claims against Defendants (defined below).

2.      ProShares consists of a series of ETFs, including the SRS Fund. ETFs, regulated by the SEC under the Investment Company Act of 1940 (the "1940 Act"), are low-cost funds that track a particular stock index and trade like stock. Non-traditional, or so-called "leveraged" and/or "inverse" ETFs, such as the SRS Fund, have exploded in popularity over the last few years, offering investors alternate vehicles to take bullish, bearish, and leveraged positions on popular stock indices. Available in a number of different forms, non-traditional ETFs have attracted increasingly significant investor assets.

3.      ProShares is the fifth largest provider of ETFs in the United States, and manages approximately 99 percent of the country's short and leveraged ETFs. ProShares designs each of its ETFs to correspond to the performance of a daily benchmark-such as the price performance, the inverse of the price performance, or a multiple of the inverse of the price performance-of an index or security. ProShares' ETFs are essentially divided into two categories: Ultra and UltraShort.

4.      ProShares sells its Ultra and UltraShort ETFs as "simple" directional plays. As marketed by ProShares, Ultra ETFs are designed to go up when markets go up; UltraShort ETFs are designed to go up when markets go down.  The SRS Fund is one of ProShares' UltraShort ETFs, hence its eponym.

5.      When the financial and real estate markets began to decline, in the summer of 2007, investors who wanted to create their own hedges or speculate that a sector would decline found a tempting and seemingly safe alternative in ProShares' UltraShort ETFs. By making it "simple ... to try to hedge against downturns or seek profit when markets fall," ProShares made

seeking profit from the financial decline sound easy. Consequently, in the wake of an unprecedented drop in housing prices accompanied by major disruptions in the credit and capital markets, Plaintiff and other investors seeking to short U.S. real estate were attracted to the SRS Fund based on its clear directive.

6.     The SRS Fund seeks investment results that correspond to twice the inverse (-200%) daily performance of the Dow Jones U.S. Real Estate Index ("DJREI"), which measures the performance of the real estate sector of the U.S. equity market. The SRS Fund is mandated to take positions in securities and/or financial instruments that, in combination, should have similar daily return characteristics as -200% of the daily return of the DJREI.

7.     ProShares touts the simplicity of its formulaic model. ProShares describes its strategy as "simple" to execute. ProShare Advisors LLC ("ProShare Advisors" or the "Advisor"), which serves as the investment advisor to the SRS Fund, purports to use a straightforward mathematical approach to investing. Indeed, Pro Shares attributes its rapid growth to the "simplicity" its ETFs bring to implementing sophisticated investment strategies.

8.     ProShares represents that its ETFs operate successfully based on an objective mathematical approach. ProShare Advisors "determines the type, quantity and mix of investment positions that a[n ETF] should hold to simulate the performance of its daily benchmark," as opposed to investing assets in stocks or financial instruments based on ProShare Advisors' view of the investment merit of a particular security, instrument, or company.

9.     In managing the assets of the SRS Fund, ProShares acknowledges that it does not conduct conventional stock research or analysis, nor forecast stock market movement or trends. This strategy is marketed as not only acceptable but even desirable because ProShares' ETFs purport to function as a result of reliable math, not subjective acumen.

10.    The SRS Fund is supposed to deliver double the inverse return of the DJREI, which fell approximately 39.2 percent from January 2, 2008 through December 17, 2008, ostensibly creating a profit for investors who anticipated a decline in the U.S. real estate market. In other words, the SRS Fund should have appreciated by 78.4 percent during this period. However, the SRS Fund actually fell approximately 48.2 percent during this period-the antithesis of a directional play.

11.    The spectacular divergence (hereinafter referred to as "tracking error") of the SRS Fund has gotten worse in 2009. In 2009, through July 30, 2009, the DJREI has fallen approximately 7.4 percent. Rather than increase 14.8 percent (double the inverse), amazingly, the SRS Fund has also fallen approximately 68 percent. There has been no directional correlation over time whatsoever.

12.    Given the spectacular tracking error between the performance of the SRS Fund and its benchmark index, the fact that Plaintiff and the Class sought to protect their assets by investing their monies on the correct directional play has been rendered meaningless. The SRS Fund is, therefore, the equivalent of a defective product. The SRS Fund does not do what it was designed to do, represented to do, or advertised to do.

13.    The Registration Statement does not disclose that the SRS Fund is altogether defective as a directional investment play. In order to sufficiently and accurately disclose this counterintuitive reality, the Registration Statement would have to clearly explain that, notwithstanding the name of the SRS Fund, the investment objective of the SRS Fund, and the purpose of ProShares' UltraShort ETFs generally, the SRS Fund would perform precisely the opposite of investors' reasonable expectations.

14.    ProShares cavalierly states that the SRS Fund seeks to replicate double the inverse return of the daily returns of the DJREI, noting that it "does not seek to achieve its stated investment objective over a period of time greater than one day." Of course, this statement does not warn investors that holding the SRS Fund for more than a day will most certainly lead to enormous losses. In fact, ProShares could not make that statement and remain in business with respect to the SRS Fund. As ProShares knows, investors do not view ETFs as day trading investment vehicles and did not day-trade the SRS Fund. Moreover, it is virtually economically impossible for all SRS Fund purchasers to sell out of their positions at the end of one day.

15.    Furthermore, ProShares does not market the SRS Fund or its other ETFs as day-trading vehicles. In fact, ProShares' Chairman has publicly stated that investors can use ProShares' ETFs "for more than a day successfully." ProShares' Registration Statement even provides hypothetical examples of fees that investors may encounter over 1 -year, 3 -year, 5 -year, and 10 year periods, indicating that long term investing in the SRS Fund is a perfectly reasonable investment strategy. ProShares' imposes no temporal limits on investors in its UltraShort ETFs. Accordingly, ProShares' "greater than one day" risk disclosure is tantamount to a kennel selling a dog that is a cat while disclosing that the dog may have defects.

16.    ProShares acknowledges on its website that "because of the daily objective of leveraged and inverse funds, investors should monitor their performance, as frequently as daily." ProShares, however, stops short of disclosing that its ETFs, including the SRS Fund, are for short-term use only. Even Direxion, one of ProShares' main competitors, has gone further, noting on its website that "Direxion Shares ETFs seek daily investment goals and should be used as short term trading vehicles."

17.    On June 11, 2009, the Financial Industry Regulatory Authority ("FINRA") fired a warning flare with the issuance of Regulatory Notice 09-31 (the "F1NRA Notice"). The FINRA Notice cautioned that "inverse and leveraged ETFs ... typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets." FINRA reminded those who deal in non-traditional ETFs that sales materials related to leveraged and inverse ETFs "must be fair and accurate." Thereafter, FINRA spokesman Herb Perone stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products...."

18.    The FINRA Notice also applied NASD Rule 2310 that "requires that, before recommending the purchase, sale or exchange of a security, a firm must have a reasonable basis for believing that the transaction is suitable for the customer to whom the recommendation is made."   As applied to leveraged and inverse ETFs, this means that "firm must understand the terms and features of the funds, including how they are designed to perform, how they achieve that objective, and the impact that market volatility, the ETF's use of leverage, and the customer's intended holding period will have on their performance."

19.    In applying NASD Rule 2210, the FINRA Notice required that "all sales materials and oral presentations used by firms regarding leveraged and inverse ETFs must present a fair and balanced picture of both the risks and benefits of the funds, and may not omit any material fact or qualification that would cause such a communication to be misleading."

20.    FINRA issued additional warnings on July 13, 2009 by way of a podcast on its website.   FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to achieve their stated objective on a daily basis-but with the effects of compounding over a longer time frame, results differ significantly. In spite of this admonishment and clear

results to the contrary, ProShares' Chairman Michael L. Sapir maintained that ProShares' leveraged and inverse ETFs can be used "for more than a day successfully."

21.     Since FINRA's warnings, Edward Jones & Co. ("Edward Jones") halted the sale of its non-traditional, leveraged ETFs, such as the SRS Fund. Edward Jones called ETFs like the SRS Fund "one of the most misunderstood and potentially dangerous types of ETFs." (Emphasis added).

22.     UBS has now also said that it would not trade ETFs that use leverage or sell an underlying asset short. Similarly, Ameriprise Financial and LPL Investment Holdings Inc. have also prohibited sales of leveraged ETFs that seek more than twice the long or short performance of their target index. Wells Fargo and Morgan Stanley Smith Barney are now also reportedly reviewing their policies on non-traditional ETFs.

23.     In a June 30, 2009, research report, Morgan Stanley advised that leveraged and leveraged inverse ETFs are "not appropriate for most investors…." In that same research report, Morgan Stanley warned that "As a result of the daily 're-leveraging' or 'deleveraging,' leveraged and leveraged inverse ETFs are likely to significantly underperform point to point returns of their benchmark index in volatile-trendless markets."

24.     As reported on July 30, 2009 by the Wall Street Journal, Charles Schwab ("Schwab") issued an unusual warning on July 28 to clients who buy non-traditional ETFs. Schwab offered a strongly worded warning on its website noting that "while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting …. Proceed with extreme caution." (Emphasis

added). The disclosures in the Registration Statement simply do not rise to this "[p]roceed with extreme caution" level of clarity.

25.    Federal securities laws call for complete and unrestricted disclosure of material facts. Here, prospective and actual investors in ProShares have been deceived by the notion of directional investment plays. It is readily apparent that ProShares has violated the spirit and purpose of the registration requirements of the Securities Act: "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions."[1] ProShares lured investors with the illusion that the SRS Fund would go up if the DJREI went down. The registration provisions are designed not only to protect immediate recipients of distributed securities but also subsequent purchasers from them.[2]

26.    The SRS Fund is not a simple investment vehicle, did not go up when its benchmark index went down, and investors in the SRS Fund have been shocked to learn that their supposedly safe hedge has caused them substantial losses. This action alleges that Defendants failed to disclose, inter alia, the following risks in the Registration Statement:

- Inverse correlation between the SRS Fund and the DJREI over time would only happen in the rarest of circumstances, and inadvertently if at all;

- The extent to which performance of the SRS Fund would inevitably diverge from the performance of the DJREI – i.e. the probability, if not certainty, of spectacular tracking error;

- The severe consequences of high market volatility on the SRS Fund's investment objective and performance;

- The severe consequences of inherent path dependency[3] in periods of high

---

[1] *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).

[2] *SEC v. Great American Industries, Inc.*, 407 F.2d 453, 463 (2d Cir. 1968).

[3] Path dependence explains how the set of decisions one faces for any given circumstance is limited by (continued...)

market volatility on the SRS Fund's performance;

- The role the SRS Fund plays in increasing market volatility, particularly in the last hour of trading;

- The consequences of the SRS Fund's daily hedge adjustment always going in the same direction as the movement of the underlying index, notwithstanding that it is an inverse leveraged ETF;

- The SRS Fund causes dislocations in the stock market;

- The SRS Fund offers a seemingly straightforward way to obtain desired exposure, but such exposure is not attainable through the SRS Fund.

## II.    **JURISDICTION AND VENUE**

27.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

28.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §133 1 and Section 22 of the Securities Act.

29.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District, and the shares of the SRS Fund trade in this District on the American Stock Exchange.

30.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

---

(…continued)

the decisions one has made in the past, even though past circumstances may no longer be relevant. Path dependency theory was originally developed by economists to explain technology adoption processes and industry evolution. The theoretical ideas have had a strong influence on evolutionary economics (e.g., Nelson & Winter 1982).

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.    PARTIES

31.    Plaintiff Jack McBride, a resident of the state of Michigan, invested assets in the SRS Fund and was damaged thereby, as detailed in the annexed Certification.

32.    Defendant ProShares Trust ("ProShares"), located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, is a Delaware statutory trust organized on May 29, 2002. ProShares Trust is registered with the SEC as an open-end management investment company under the 1940 Act. ProShares has a series of ETFs, the shares of which are all listed on the American Stock Exchange. Each ProShares ETF has its own CUSIP number and exchange trading symbol. Each ProShares ETF issues and redeems Shares on a continuous basis at net asset value ("NAV") in large, specified numbers of Shares called "Creation Units." For each ETF, a Creation Unit is comprised of 75,000 shares. In 2008, ProShares ranked second among all U.S. ETF companies in year-to-date net flows. ProShares now manages over $20 billion, accounting for 99 percent of the country's short and leveraged ETFs.

33.    Defendant ProShare Advisors LLC ("ProShare Advisors"), located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, serves as the investment advisor to the SRS Fund. ProShare Advisors provides investment advice and management services to ProShares and its ETFs, including the SRS Fund. ProShare Advisors oversees the investment and reinvestment of the assets in the SRS Fund. ProShare Advisors is owned by Defendants Michael L. Sapir, Louis M. Mayberg and William E. Seale.

34.    Defendant SEI Investments Distribution Co. ("SEI"), located at 1 Freedom Valley Drive, Oaks, PA 19456, is the distributor and principal underwriter for the SRS Fund. SEI has

been registered with the SEC and FINRA since 1982. SEI was hired by ProShares to distribute shares of the SRS Fund to broker/dealers and, ultimately, shareholders.

35.    Defendant Michael L. Sapir ("Sapir"), an Interested Trustee of ProShares, has been the Chairman and Chief Executive Officer of ProShare Advisors since its inception. Sapir signed the Registration Statement.

36.    Defendant Louis M. Mayberg ("Mayberg") has been President of ProShare Advisors since inception. Mayberg signed the Registration Statement.

37.    Defendant Russell S. Reynolds, III ("Reynolds") is a Non-Interested Trustee of ProShares who signed the Registration Statement.

38.    Defendant Michael Wachs ("Wachs") is a Non-Interested Trustee of ProShares who signed the Registration Statement.

39.    Defendant Simon D. Collier ("Collier") has been ProShares' Treasurer since June 2006. In his capacity as Treasurer, Collier signed the Registration Statement.

40.    The defendants enumerated in Paragraphs 33-37 are hereinafter referred to as the "Individual Defendants." The Individual Defendants, in their respective roles, ultimately control the operations of the SRS Fund. The Board of Trustees of ProShares is responsible for the general supervision of all of the SRS Fund. The officers of ProShares are responsible for the day-to-day operations of the SRS Fund.

## IV.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the SRS Fund pursuant or traceable to the Company's false and misleading Registration Statement and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believe that there are thousands of members in the proposed Class.

43.    Plaintiffs claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

       (a)    whether the Securities Act was violated by Defendants' acts as alleged herein;

       (b)    whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations and/or management of ProShares; and

       (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

46.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

**A.     Traditional ETFs**

47.     ETFs are investment companies that are legally classified as open-end companies or Unit Investment Trusts. ETFs are frequently considered low cost index mutual funds that trade like stocks. ETFs, however, differ from traditional mutual funds in the following ways:

(a)     ETFs do not sell individual shares directly to investors and only issue shares in large blocks (of 50,000 shares, for example) that are known as "Creation Units";

(b)     Investors generally do not purchase Creation Units with cash. Instead, investors buy Creation Units with a basket of securities that generally mirrors an ETF portfolio;

(c)     After purchasing a Creation Unit, an investor often splits it up and sells the individual shares on a secondary market. This permits other investors to purchase individual shares (instead of Creation Units); and

(d)     Investors who want to sell their ETF shares have two options: (1) they can sell individual shares to other investors on the secondary market, or (2) they can sell the Creation Units back to the ETF. ETFs generally redeem Creation Units by giving investors the securities that comprise the portfolio instead of cash.

48.     In 1993, the American Stock Exchange launched the first traditional ETF, called the Spiders (or SPDR), which tracked the S&P 500. Soon after, more ETFs were introduced to the market, for example the Diamonds ETF in 1998, which tracked the Dow Jones Industrial Average, and the Cubes in 1999, which tracked the NASDAQ 100.

**B.     Non-Traditional/Leveraged ETFs**

49.     Non-traditional, or leveraged ETFs-sometimes referred to as "exotic" ETFs-are an even newer breed of ETFs that seek to deliver multiples of the performance of the index or benchmark they track. Some leveraged ETFs are "inverse" or "short" funds, meaning that they

seek to deliver the opposite of the performance of the index or benchmark they track. Like traditional ETFs, some inverse ETFs track broad indices, some are sector-specific, and still others are linked to commodities or currencies. Inverse ETFs are often marketed as a way for investors to profit from, or at least hedge their exposure to, downward moving markets.

50.    Some non-traditional ETFs, such as the SRS Fund, are both short and leveraged, meaning that they seek to achieve a return that is a multiple of the inverse performance of the underlying index. An inverse ETF that tracks the S&P 500, for example, seeks to deliver the inverse of the performance of the S&P 500, while a double-leveraged inverse S&P 500 ETF seeks to deliver twice the opposite of that index's performance. To accomplish their objectives, leveraged and inverse ETFs pursue a range of complex investment strategies through the use of swaps, futures contracts and other derivative instruments.

51.    Most leveraged and inverse ETFs "reset" daily. This results in "compounding" effects. Using a two-day example, if the index goes from 100 to close at 101 on the first day and back down to close at 100 on the next day, the two-day return of an inverse ETF will be different than if the index had moved up to close at 110 the first day but then back down to close at 100 on the next day. In the first case with low volatility, the inverse ETF loses 0.02 percent; but, in the more volatile scenario, the inverse ETF loses 1.82 percent.

## SUBSTANTIVE ALLEGATIONS

**A.    ProShares' Non-Traditional UltraShort ETFs**

52.    ProShares describes its UltraShort ETFs as vehicles that "[s]eek profit from downturns." ProShares' UltraShort ETFs "provide a simple way to try to seek profit from a market segment that you think is poised to fall."

53.    On its website, ProShares provides the following "Q&A" regarding its UltraShort ETFs, in relevant part:

Q: What are Short Pro Shares?

A: They are the first exchange traded funds (ETFs) specifically designed to go up when markets go down. Short ProShares are built to move in the opposite direction of the markets.

Here's how they work: if the S&P 500® Index drops 1% in a day, ProShares Short S&P500® should gain 1% that day (before fees and expenses). UltraShort ProShares double the effect. ProShares UltraShort S&P500® should gain 2% (before fees and expenses) if the index slips 1% in a day.

On the flip side, Short ProShares will lose value if markets rise. If the S&P 500 gains 1% in a day, ProShares Short S&P500 should lose 1%, and ProShares UltraShort S&P500 should lose 2% (again, before fees and expenses). Short ProShares and UltraShort ProShares make it simple for you to execute sophisticated strategies designed to manage risk or enhance return potential.

Q: How are Short ProShares different from short selling?

A: Short selling a stock or ETF requires a margin account. Short ProShares don't. They allow you to get short exposure without the hassles-or expense-of a margin account. It's as simple as buying a stock. (Emphasis added).

Accordingly, ProShares represents that its "short" ETFs are specifically designed to "go up when markets go down," and are "built to move in the opposite direction of the markets." ProShares' places no temporal limits on investors in its UltraShort ETFs.

**B.    The SRS Fund**

54.    On or about January 30, 2007, ProShares registered the SRS Fund as an ETF. The SRS Fund seeks investment results, before fees and expenses, that correspond to twice the inverse daily performance of the DJREI. The DJREI is a float-adjusted capitalization-weighted, real-time index that provides a broad measure of the U.S. real estate securities market. The component companies of the DJREI include those that invest directly or indirectly through development, management or ownership of shopping malls, apartment buildings and housing

developments, and real estate investment trusts ("REITs") that invest in apartments, office and retail properties.

55.    The SRS Fund takes positions in securities and/or financial instruments that, in combination, should have similar return characteristics as -200% of the daily return of the index. The SRS Fund's principal investment strategies include:

- Taking positions in financial instruments (including derivatives) that Pro Share Advisors believes, in combination, should have similar daily price return characteristics as twice (200%) the inverse of the DJREI;

- Committing at least 80% of its assets to investments that, in combination, have economic characteristics that are inverse to those of the DJREI;

- Employing leveraged investment techniques in seeking its investment objective;

- Investing assets not invested in financial instruments in debt securities and/or money market instruments; and

- Concentrating investments in a particular industry or group of industries to approximately the same extent as the Index is so concentrated. Because all of the securities included in the Index are issued by companies in the real estate industry group, the Fund will be concentrated approximately 100% in the real estate industry.

56.    Investors who acquired shares in the SRS Fund during the Class Period thought they were protecting their assets by hedging against the unprecedented drop in housing prices across the United States. Indeed, the DJREI was down by 50 percent in 2008, and it has continued to decline in 2009. However, instead of increasing in value as the DJREI declined, the value of the SRS Fund also declined, thereby causing financial losses to Plaintiff and the Class even though, directionally speaking, they invested correctly.

57.    The SRS Fund is supposed to deliver double the inverse return of the DJREI, which fell 39.2 percent from January 2, 2008 through December 17, 2008, ostensibly creating a

profit (or an offset against other losses) for investors who anticipated a decline in the U.S. real estate market. The SRS Fund, however, actually fell 48.2 percent over the same period.

58.    The tracking error between anticipated and actual performance has increased in 2009. In 2009, through July 30, 2009, the DJREI has fallen approximately 7.4 percent. Further revealing its dysfunction, the SRS Fund has also fallen approximately 68 percent.

59.    Given this dramatic tracking error, the fact that Plaintiff and the Class invested their monies on the correct directional play has been rendered meaningless. The SRS Fund is, therefore, the equivalent of a defective product. The SRS Fund does not do what it was designed to do, represented to do, or advertised to do.

60.    The Registration Statement does not disclose that the SRS Fund is altogether defective as a directional investment play. In order to sufficiently and accurately disclose this counterintuitive reality, the Registration Statement would have to clearly explain that, notwithstanding the name of the SRS Fund, the investment objective of the SRS Fund, and the purpose of ProShares' UltraShort ETFs generally, the SRS Fund would perform precisely the opposite of investors' reasonable expectations.

61.    ProShares cavalierly states that the SRS Fund seeks to replicate double the inverse return of the daily returns of the DJREI, noting that it "does not seek to achieve its stated investment objective over a period of time greater than one day." Of course, this statement does not warn that holding SRS Fund for more than a day will lead to enormous losses. As ProShares knows, investors did not view ETFs as day trading investment vehicles and did not day trade the SRS Fund. In fact, it is virtually economically impossible for all SRS Fund purchasers to sell out of their positions at the end of one day.

62.    Furthermore, ProShares does not market the SRS Fund or its other ETFs as day trading vehicles. In fact, ProShares' Chairman has publicly stated that investors can use ETFs "for more than a day successfully." ProShares' Registration Statement even provides hypothetical examples of fees that investors may encounter over 1year, 3 -year, 5 -year, and 10 year periods. There are no temporal limits placed on investors in the SRS Fund.

63.    ProShares acknowledges on its website that "because of the daily objective of leveraged and inverse funds, investors should monitor their performance, as frequently as daily." ProShares, however, stops short of disclosing that its ETFs are for short-term use only. Even Direxion, one of ProShares' main competitors, has gone further. On its website, Direxion notes that its ETFs "should be used as short term trading vehicles."

## C.    The False and Misleading Registration Statement

64.    On August 30, 2006, ProShares filed a Registration Statement with the SEC onForm N1-A, which incorporates by reference ProShares' prospectuses dated January 23, 2007, and October 1, 2008, as supplemented on December 1, 2008, January 15, 2009, April 7, 2009, and May 26, 2009, as well as ProShares Annual and Semi-Annual reports, and Statements of Additional Information (collectively, the "Registration Statement"). The Registration Statement was signed by the Individual Defendants.

65.    Primarily with respect to leverage, compounding, and volatility risks, the August 30, 2006 Form N1-A disclosed:

> The UltraShort Real Estate ProShares employs leveraged investment techniques to achieve its investment objective. Over time, the use of leverage, combined with the effect of compounding, will have a more significant impact on the Fund's performance compared to the index underlying its benchmark than a fund that does not employ leverage. Therefore, the return of the index over a period of time greater than one day multiplied by a fund's specified multiple or inverse multiple (e.g., 200% or -200%) will not generally equal a fund's performance over that

same period.

*　　　*　　　*

*Volatility Risk* UltraShort Real Estate ProShares seeks to achieve a multiple of an index and therefore will experience greater volatility than the index underlying its benchmark and consequently has the potential for greater losses. (Emphasis added).

66.    In the January 23, 2007 Prospectus, ProShares stated:

Over time, the cumulative percentage increase or decrease in the net asset value of the Fund may diverge significantly from the cumulative percentage increase or decrease in the multiple of the return of the underlying Index due to the compounding effect of losses and gains on the returns of the Fund. Consequently, for periods greater than one day, investors should not expect the return of the Fund to be twice the return of the underlying Index. In addition, in trendless or flat markets it is expected that the Fund will underperform its benchmark Index.

*　　　*　　　*

*Volatility Risk* UltraShort Real Estate ProShares seeks to achieve a multiple of an index and therefore will experience greater volatility than the index underlying its benchmark and consequently has the potential for greater losses. (Emphasis added).

67.    In its Annual Report, as of May 31, 2008, ProShares disclosed the following:

*Compounding of Daily Returns and Volatility*: ProShares ETFs are designed to provide either 200%, -200% or -100% of index performance on a daily basis (before fees and expenses). A common misconception is that the Funds also should provide 200%, -200% or -100% of index performance over longer periods, such as a week, month or year. However, Fund returns over longer periods are generally less than or greater than the returns that would result from such an expectation.... This is due to several factors, but a significant one is index volatility and its effect on fund compounding. In general, periods of higher index volatility will cause the effect of compounding to be more pronounced, while periods of lower index volatility will produce a more muted or even positive effect. Index volatility measures how much an index's value fluctuates, in either direction, over time. A higher volatility means that the index has experienced more dramatic changes in value. A lower volatility means that the index has changed at a steadier pace. (Emphasis added).

68.    The Statement of Additional Information to the October 1, 2008 Prospectus depicts three tables intended to illustrate: (a) estimated fund return over one year when the fund objective is to seek daily investment results, before fund fees and expenses and leverage costs, that correspond to twice (200%) the daily performance of an index; (b) estimated fund return over one year when the fund objective is to seek daily investment results, before fees and expenses, that correspond to the inverse (-100%) of the daily performance of an index; and (c) estimated fund return over one year when the fund objective is to seek daily investment results, before fees and expenses, that correspond to twice the inverse (-200%) of the daily performance of an index. Without additional narrative or explanation, ProShares states that these three tables are intended to isolate the effect of index volatility and index performance on the return of a leveraged Fund. However, these tables, just as the other disclosures in the Registration Statement, are insufficient to explain the miserable failure of the SRS Fund as a term trade or hedge.

69.    All of the above discussed disclosures were false and/or misleading because they failed to disclose:

- Inverse correlation between the SRS Fund and the DJREI over time would only happen in the rarest of circumstances, and inadvertently if at all;

- The extent to which performance of the SRS Fund would inevitably diverge from the performance of the DJREI - i.e., the probability, if not certainty, of spectacular tracking error;

- The severe consequences of high market volatility on the SRS Fund's investment objective and performance;

- The severe consequences of inherent path dependency[4] in periods of high

---

[4] Path dependence explains how the set of decisions one faces for any given circumstance is limited by the decisions one has made in the past, even though past circumstances may no longer be relevant. Path (continued...)

market volatility on the SRS Fund's performance;

- The role the SRS Fund plays in increasing market volatility, particularly in the last hour of trading;

- The consequences of the SRS Fund's daily hedge adjustment always going in the same direction as the movement of the underlying index, notwithstanding that it is an inverse leveraged ETF;

- The SRS Fund causes dislocations in the stock market;

- The SRS Fund offers a seemingly straightforward way to obtain desired exposure, but such exposure is not attainable through the SRS Fund.

70.    Perhaps most importantly, ProShares failed to disclose that mathematical compounding actually prevents the SRS Fund from achieving its stated investment objective over a period of time greater than one day. ProShares' affiliate, ProShares Trust II[5], disclosed this material fact in a Form 10-K filed with the SEC on March 31, 2009 ("The Funds do not seek to achieve their stated investment objective over a period of time greater than one day *because mathematical compounding prevents the Funds from achieving such results*.") (Emphasis added). Disclosures that merely state the return of the index over a period of time greater than one day multiplied by a fund's specified multiple or inverse multiple "may" or "will not"

_____

(...continued)

dependency theory was originally developed by economists to explain technology adoption processes and industry evolution. The theoretical ideas have had a strong influence on evolutionary economics (e.g., Nelson & Winter 1982).

[5] ProShares Trust II is a Delaware statutory trust formed on October 9, 2007, and is a commodity pool as defined in the Commodity Exchange Act. ProShares Trust II is currently organized into separate series of ETFs, just like ProShares. ProShares Trust II employs the same purportedly formulaic model as ProShares.

generally" equal a fund's performance over that same period are misleading given the virtual *impossibility* of the SRS Fund's ability to correlate to the DJREI over time.

71.    By its very construct, the SRS Fund actually exacerbates volatility, thus directly contributing to its own failure as an instrument for anything other than a day trade. By bifurcating an index into long side and short side ETFs, ProShares eliminates an "out" for the market maker, causing the market maker to actively hedge in the underliers. With a normal security, all buyers and sellers come to a central meeting place, and buyers can be matched easily with sellers, and price discovery is reached. However, when you set up a specifically one-sided instrument, rather than one common product that people can be either long or short on, an ETF contributes to dislocations. ProShares purposefully segments the longs and the shorts, and that, by definition, creates illiquidity. ProShares failed to sufficiently disclose as much to Plaintiff and the Class.

72.    ProShares' feeble attempt to explain the relationship between compounding and volatility-vis-a-vis an acknowledgment that "periods of higher index volatility will cause the effect of compounding to be more pronounced"-does not at all explain to investors that: (a) volatility erodes returns and wealth accumulation, a fact not commonly understood; (b) the path that returns take over time has important effects on mid- and long-term total return achieved; and (c) the return-volatility relationship matters even more so where leverage is employed. In short, with a double leveraged ETF such as the SRS Fund, investors receive at least twice the risk of the index but less than twice the return. The drag imposed by return volatility makes such a result inevitable. Clearly, this is not a desirable outcome for investors seeking to hedge against a declining market.

73.     Prospective and actual investors in ProShares have been misled. The SRS Fund is not a "simple" kind of investment. ProShares has violated the spirit and purpose of the registration requirements of the Securities Act, which are "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions."[6] The registration provisions are designed not only to protect immediate recipients of distributed securities but also subsequent purchasers from them.[7] Leveraged and inverse ETFs such as the SRS Fund do not constitute a suitable or solid investment or hedging strategy for investors who intend to hold their positions for longer than one day. ProShares failed to disclose these material facts to Plaintiff and the Class.

**D.     Red Flags Raised by FINRA & Others**

74.     In June 2009, FINRA issued Regulatory Notice 09-31, in which FINRA "remind[ed] firms of their sales practice obligations in connection with leveraged and inverse ETFs." In particular, FINRA admonished that sales materials related to leveraged and inverse ETFs "must be fair and accurate." FINRA further cautioned:

> Suitability
>
> NASD Rule 2310 requires that, before recommending the purchase, sale or exchange of a security, a firm must have a reasonable basis for believing that the transaction is suitable for the customer to whom the recommendation is made. This analysis has two components. ***The first is determining whether the product is suitable for any customer, an analysis that requires firms and associated persons to fully understand the products and transactions they recommend.***
>
> *            *            *

---

[6] *SEC v. Ralston Purina Co.*, *supra*, n. 1

[7] *SEC v. Great American Industries, Inc.*, *supra*, n. 2.

Communications With the Public

NASD Rule 2210 prohibits firms and registered representatives from making false, exaggerated, unwarranted or misleading statements or claims in communications with the public. *Therefore, all sales materials and oral presentations used by firms regarding leveraged and inverse ETFs must present a fair and balanced picture of both the risks and benefits of the funds, and may not omit any material fact or qualification that would cause such a communication to be misleading....* (Emphasis added).

75.    FINRA spokesman Herb Perone has stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, *are extremely complicated and confusing products*, and the marketing and sale of these products to unsophisticated retail investors is very much on FINRA's radar screen." (Emphasis added).

76.    FINRA issued additional guidance on July 13, 2009 by way of a podcast on its website. FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to achieve their stated objective on a daily basis-but with the effects of compounding over a longer time frame, results differ significantly. In spite of this admonishment, Defendant Sapir maintains that ProShares' leveraged and inverse ETFs can be used "for more than a day successfully."

77.    On July 15, 2009, Massachusetts' Secretary of State William Galvin announced that Massachusetts had begun a probe into the sales practices of ProShares, among other firms heavily involved in structuring leveraged ETFs. Galvin stated: "[s]ince 2006 these products have become increasingly popular. Yet, due to the daily nature of the leverage employed, there is no guarantee of amplified annual returns and they generally incur greater transaction costs than traditional exchange traded funds."

78.    On July 21, 2009, as reported by the Wall Street Journal in an article entitled "Getting Personal, Edward Jones Drops ETFs," Edward Jones & Co. ("Edward Jones") halted

the sale of its non-traditional, leveraged ETFs, such as the SRS Fund. Edward Jones called ETFs like the SRS Fund *"one of the most misunderstood and potentially dangerous types of ETFs."* (Emphasis added).

79.     On July 27, 2009, in a letter to wealth management clients, as reported by the Wall Street Journal in an article entitled "Strange Traded Funds," UBS said it would not trade ETFs that use leverage or sell an underlying asset short. Similarly, on the heels of the FINRA Notice, Ameriprise Financial and LPL Investment Holdings Inc. have also prohibited sales of leveraged ETFs that seek more than twice the long or short performance of their target index. Wells Fargo is now also reportedly reviewing its policy on non-traditional ETFs.

80.     On July 30, 2009, the Wall Street Journal published an article entitled "Warning Signs Up For Leveraged ETFs," in which it was reported that Morgan Stanley Smith Barney is reviewing how it sells leveraged ETFs. The article also observed that Charles Schwab ("Schwab") issued an unusual warning on July 28 to clients who buy non-traditional ETFs. Schwab offered a strongly worded warning on its website noting that *"while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting.... Proceed with extreme caution."* (Emphasis added). The disclosures in the Registration Statement simply do not rise to this "[p]roceed with extreme caution" level of clarity.

81.     On August 1, 2009, Reuters reported that Massachusetts subpoenaed four major financial institutions seeking details as to how leveraged ETFs are marketed and sold.

82.     On August 1, 2009, the Wall Street Journal quoted Morningstar's director of ETF analysis, Scott Burns, who recently poignantly observed: *"Hedges [like the SRS Fund] aren't supposed to become less trustworthy when you really need them."* (Emphasis added).

## COUNT I
### (Violations of § 11 of the 1933 Act Against All Defendants)

83.     This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

84.     Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against all defendants.

85.     ProShares is the issuer of the shares sold via the Registration Statement. The Individual Defendants are signatories or authorizers of the Registration Statement.

86.     ProShares is absolutely liable for the material misstatements in and omissions from the Registration Statement. The other Defendants owed purchasers of the stock the duty to make a reasonable investigation of the statements contained in the Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. These Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Registration Statement as set forth herein. None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that statements contained in the Registration Statement and Prospectus were true or that there was not any omission of material fact necessary to make the statements made therein not misleading.

87.    As signatories or authorizers of the Registration Statement, directors, officers of the SRS Fund or controlling persons of the issuer, the Defendants owed the purchasers of SRS shares, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time that it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Registration Statement and Prospectus as set forth herein. As such, Defendants are liable to Plaintiff and the Class.

88.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act. As a direct and proximate result of Defendants' wrongful conduct, the market price for SRS shares was artificially inflated, and Plaintiff and the Class suffered substantial damages in connection with the purchase thereof. Plaintiff and the Class all purchased SRS stock issued pursuant and/or traceable to the Registration Statement.

89.    Plaintiff and other members of the Class purchased or otherwise acquired their SRS shares without knowledge of the untruths or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by Defendants' misconduct and by the material misstatements and omissions in the Registration Statement.

90.    At the time of their purchases of SRS shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to June 2008. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts

upon which this complaint is based to the time that Plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

**COUNT II**
**(Violations of § 15 of the Securities Act Against the Individual Defendants)**

91.     Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against the Individual Defendants.

92.     Each of the Individual Defendants named herein acted as a controlling person of the Company within the meaning of Section 15 of the Securities Act. The Individual Defendants were each trustees or officers and/or directors of ProShares charged within the legal responsibility of overseeing its operations. Each controlling person had the power to influence and exercised the same to cause his controlled person to engage in the unlawful acts and conduct complained of herein.

93.     By reason of such conduct, the Defendants named in this Count are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the SRS Fund.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

554090

28

B.      awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      awarding punitive damages to Plaintiff and members of the Class;

D.      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  August 21, 2009

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: _Gregory M Nespole_

Gregory M. Nespole (GN 6820)
Mark C. Rifkin
Russell S. Miness
270 Madison Avenue
New York, NY  10016
Telephone:     (212) 545-4600
Facsimile:     (212) 545-4653


LAW OFFICES OF BRUCE G. MURPHY
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL 32963
Telephone:     (772) 231-4202

554090

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _Jack McBride_ , ("Plaintiff") declare the following claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized its filing. Plaintiff retains the Law Offices of Bruce G. Murphy, P.C. and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.    Plaintiff did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 500 | SRS | B | 7-20-09 | 18.8178 |
| 500 | SRS | S | 7-30-09 | 15.3200 |

Please list other transactions on a separate sheet of paper, if necessary.

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _10_ day of _August_ , 200_9_.

_____
Signature

_Jack McBride_
Print Name